Filed 1/30/23  P. v. Lassa CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>    v.<br><br>AUSTIN MICHAEL LASSA,<br><br>  Defendant and Appellant. | F082168<br><br>(Super. Ct. No. CRF62978)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County. Kevin M. Seibert, Judge.

Martin Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Austin Michael Lassa of seven counts of first-degree residential burglary (Pen. Code,[1] §§ 459, 460, subd. (a)), one count of the second degree burglary of a detached garage (§§ 459, 460, subd. (b)), one count of possession of stolen

---

[1] All undesignated statutory references are to the Penal Code.

property valued at more than $950 (§ 496, subd. (a)), and one misdemeanor count of possessing burglary tools (§ 466).

The trial court sentenced Lassa to a term of 15 years 4 months: On the residential burglaries, an upper term of six years for count 1, plus consecutive 16-month sentences (one-third the middle term) on counts 2, 3, 5, 6, 8, and 9; a consecutive eight months (one-third the middle term) on the second degree burglary in count 7; a concurrent three years (the upper term) on the receiving stolen property charge in count 10; and a six-month concurrent sentence on the misdemeanor burglary tools conviction in count 11. Lassa was also given an additional consecutive eight-month subordinate term based on a probation violation in an unrelated case from Tuolumne County Superior Court number CRF57275.[2]

Lassa now claims: (1) His trial counsel was constitutionally ineffective for failing to object to testimony that implied Lassa was on probation at the time of the charged offenses; (2) The trial court prejudicially erred by allowing inadmissible character and hearsay evidence regarding the local community's beliefs as to Lassa's guilt; (3) The residential burglary conviction in count 1 must be reversed because the prosecutor failed to comply with the procedural prerequisites for a conditional examination of the victim; (4) Even if the alleged errors were not individually prejudicial, their cumulative effect was prejudicial and mandates reversal; and (5) The matter must be remanded for resentencing because of two intervening legislative amendments to section 1170 that have affected a trial court's discretion when imposing either an upper or lower term sentence.

The People deny Lassa's assignments of trial error and, in the alternative, argue any error was harmless, both individually and cumulatively. They agree the ameliorative

---

[2] Lassa was on a previous grant of probation, which involved a felony charge of resisting or obstructing an executive officer (§ 69) and a misdemeanor vandalism charge (§ 594, subd. (b)(1)). The trial court revoked probation and imposed a previously suspended sentence on the felony and a concurrent one-year jail term on the misdemeanor. Lassa has not appealed from this sentence.

changes to section 1170 retroactively apply to Lassa and that a remand for resentencing is required.

We reject Lassa's substantive claims but agree his sentence must be reversed and the matter remanded for resentencing due to the changes made to section 1170. The judgment is therefore affirmed in part and reversed in part.

## FACTS

Because there are no real factual disputes, we need not lay out the facts in exhaustive detail. Additional facts specific to our discussion of the issues raised are found below.

Suffice it to say that from October 2019 to April 2020, seven residences and one detached residential garage were burglarized in the semi-rural Crystal Falls neighborhood in the Sierra foothills outside the town of Sonora. (See the aerial photo maps of the area and the burglary locations depicted in People's Exhibit No. 2.) A wide variety and substantial amount of property was taken in these burglaries. Not so coincidentally, as it turned out, Lassa lived with his mother in the middle of the same small neighborhood community during the period in question.

On April 13, 2020,[3] at about 12:45 a.m., a sheriff's deputy was patrolling the area and saw a shadow moving through the yard in front of Lassa's house. Shining his patrol car spotlight on the figure, he saw Lassa dressed in all black clothing with black gloves and a black ski-mask over his head, riding a bicycle and holding a black bag in his hand. Lassa dropped the bike and the bag, took off his gloves, and threw them on the ground. The deputy approached and told Lassa he wanted to talk to him about a recent burglary, but Lassa said he did not want to talk and walked away. The deputy knew that Lassa was on probation and ordered him to come back. Lassa "reluctantly complied," sat down on the driveway, and began yelling and cursing at the deputy when his mother came outside. Lassa calmed down and continued to deny knowing anything about a burglary but when backup deputies arrived, he became angry, stood up, and said he was "done" and was

---

[3] References to dates are to dates in 2020 unless otherwise stated.

3.

going to just walk away. The deputies disagreed and, after a brief struggle, Lassa was detained.

Deputies searched the bag Lassa had been holding and found nine silver and gold chains, a Star Wars drone, and a "bench type vice [*sic*]." On his person, deputies found a meth pipe in one pocket, a Leatherman multi-tool on his belt, and a flashlight with tape covering most of the lens in another pocket. One of the deputies noticed the plier-type end of the multi-tool had "fresh marks" consistent with possibly prying something. He later opined at trial that the marks on the tool were consistent with the damage done to the front door one of the burglary victims had described.

Deputies also searched Lassa's residence. Behind the house, in the back area of the property, they found numerous items: several bicycles, two air compressors, a phone, a phone box, canoes, and wood cutting equipment. One of the bikes had been reported stolen during one of the burglaries. In the garage were several more items, including a 40-inch television and other items belonging to another of the burglary victims. In sum, deputies found at least one missing item from each of the seven charged burglaries in this case.[4]

Lassa was asked about the items found in the garage. He said he bought the recently stolen television for about $60 and had had it for about two and one-half years. He said stolen snowboards in the garage belonged to a friend and his girlfriend. In response to a question about some stereo speakers that had been stolen from one victim's house, Lassa said he had purchased them on eBay for about $100 each about two and one-half years ago. When asked about a stolen bicycle found in the back yard, Lassa said he got it from his deceased uncle about two years earlier. With respect to some reported stolen tools, Lassa said a friend had given him some of them, but he had won most of

---

[4] According to the probation officer's report, the total estimated value of the stolen items found just in the garage was $26,924. The victim in count 1 testified his loss was "[$]26,000 and change." Lassa does not contest that the value of the stolen property found was greater than $950.

4.

them on an online "giveaway website." For many of the other stolen items, Lassa claimed he had no idea how they had gotten into his garage.[5]

During the search of the garage, deputies also found a UMX brand cellphone still attached to a charging cable. In addition, Lassa's next-door neighbors had found an LG brand cellphone on their property and turned it over to deputies. On the LG phone were photos of some of the stolen property, underneath which were captions with apparent prices. There were also numerous message threads between Lassa and others regarding burglaries, the loot, and negotiations over prices. On the UMX phone, there were more images of stolen or suspected stolen property from the reported burglaries. In addition, there were more message threads indicating Lassa was advertising property stolen from the burglaries for sale and listing his prices. Some threads even showed Lassa apparently bartering with other individuals for drugs as well as for cash in exchange for stolen goods.

About a month before Lassa's arrest, a neighbor who knew Lassa, and who later repaired the damaged front door of one of the burglary victims, saw Lassa riding a bicycle carrying a power drill and a lap-top computer or small flat-screen television monitor under his arm about a mile from the victim's house. Among the items missing but never recovered from that victim's home were a small television and a power drill.

Finally, deputies listened in on jail phone calls between Lassa and his mother in which mother chastised Lassa for his thievery, and to which Lassa made no denials. Lassa's mother testified Lassa worked for himself in November 2019 by cutting firewood and doing yardwork. However, she admitted Lassa spent "a lot of time out of the house at night on his bicycle."

---

[5] Among those items was a .45 caliber Ruger Nighthawk stolen in the burglary charged in count 1, the possession of which by convicted felon Lassa could be quite problematic for him.

5.

## DISCUSSION

### I.    Ineffective Assistance of Counsel

Lassa first contends his trial counsel was constitutionally ineffective for failing to object to testimony that implied he was on probation at the time of the charged offenses. We conclude he has not met his burden of showing such a claim on this direct appeal.

### A.  Additional Factual Background

At the outset of his testimony, Tuolumne County Sheriff's Deputy Michael O'Brien was asked about his assignment in April 2020. He responded, "I was on the high risk probation supervision team…." He explained this was a "specialized unit that pairs with the probation department who go out and supervise parolees, early released prisoners of the State prison, and probationers who are on probation throughout Tuolumne County." O'Brien said he and others had gone to Lassa's residence on the morning of April 14 to "conduct a probation search on his residence because they knew he was on searchable felony probation." He went with the "high risk supervision team," which included a "Supervising [P]robation Officer," and a "Senior Probation Officer." He also spoke with Lassa's mother to let her know that they "were going to be conducting a probation search of the residence."

Deputy Brandon Green testified that several items related to this case were "located during a probation search." Similarly, Deputy Phillip Halencak testified that when he first contacted Lassa on the night of April 13, he told him that he knew he was on probation. Halencak also stated several times that he and other deputies had conducted "a probation search" on Lassa and his residence.

Defense counsel did not object to any of these references to Lassa's probationary status, the probation "team," or the probation searches.

Lassa now claims his trial counsel was constitutionally ineffective for failing to object to the deputies' testimony implying Lassa was on probation. He predicates his contention with an argument that the above-referenced instances of deputies mentioning "probation" were "irrelevant to the issue of his guilt and should not have been admitted." He further insists the deputies' mere mention of the term "probation search," or that

6.

Lassa was "on probation," constituted "inadmissible character evidence under Evidence Code section 1101." (Capitalization omitted.)

Lassa acknowledges that his trial counsel's failure to object to the deputies' testimony obviates this evidentiary claim of error on appeal. We agree and the issue is therefore forfeited. (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29 (*Miranda-Guerrero*) [defendant must timely object on the same ground and must request the jury be admonished to disregard the impropriety]; *People v. Gomez* (2018) 6 Cal.5th 243, 286 (*Gomez*) [there must be a specific and timely objection in the trial court on the same grounds sought to be urged on appeal]; see Evid. Code, § 353, subd. (a).)

Consequently, Lassa takes a different tack and makes the alternative contention that his counsel was constitutionally ineffective for failing to object to the witnesses' use of the allegedly offending terms. As a result, the scope and nature of our review also changes, and we focus not on the admissibility of evidence Lassa was on probation or subjected to probation searches, but instead on whether his trial counsel was constitutionally ineffective for not objecting to it, regardless of whether or not the evidence was admissible.[6]

## B. Legal Background

"An ineffective assistance claim has two components: A [defendant] must *show* that counsel's performance was deficient, *and* that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*), italics added; see *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Both components "are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record *affirmatively discloses* counsel had no rational tactical purpose for the challenged

_____

[6] The People argue that Lassa's probationary status was admissible, and Lassa obviously disagrees. We need not and do not enter that fray because our focus is on trial counsel's representation. We shall assume without deciding that the evidence regarding Lassa's probationary status was inadmissible.

act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*), italics added; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 ["deficient performance [must be] based upon the four corners of the record"]; *In re Carpenter* (1995) 9 Cal.4th 634, 646 [review on direct appeal "is limited to the four corners of the record on appeal"].)

"When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did…. Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the *presumption* that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " (*In re Gay, supra*, 8 Cal.5th at p. 1073, italics added; see *Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Harrington*) ["Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."]; cf. *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 ["Surmounting *Strickland*'s high bar is never an easy task."].)

Lassa's "burden in this regard 'is difficult to carry' in this case, because this is a direct appeal and the record does not disclose the reason for counsel's failure to object." (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).) Moreover, because deciding whether to object is inherently a tactical decision, the failure to do so will rarely establish ineffective assistance of counsel. (*Johnsen, supra,* 10 Cal.5th at p. 1165.) This "is not one of those rare cases." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

Furthermore, because a defendant "must *demonstrate* that counsel's representation 'fell below an objective standard of reasonableness,' " as measured by " 'prevailing professional norms,' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added), "[r]arely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th

697, 736.) As a result, such claims " 'of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*); see also *People v. Mayfield* (1993) 5 Cal.4th 142, 188 ["tactical choices presented to us on a silent record … are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them"].)

As for the prejudice component, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693.) Rather, "[t]he defendant must *show* that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694, italics added.) A conclusory assertion, without more, does not show such a probability.

### C. Analysis

Lassa points to about ten instances where three of the nine testifying Sheriff's deputies incidentally used the terms "probation" or "probation search" in their testimony. He then summarily claims there was no conceivable strategic reason why trial counsel would have chosen to allow the jury to hear these suggestions that Lassa may have been on probation. We are not persuaded.

Rather, there may well have been reasons why trial counsel here chose not to object. "Unlike a later reviewing court, the [trial] attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." (*Harrington, supra,* 562 U.S. at p. 105.) Thus, trial counsel may have concluded that any objection to these contextual references to probation — when the actual import of the deputies' testimony was on what was found and how the deputies knew the midnight rider was indeed Lassa — might possibly backfire by instead diverting the jury's attention to speculate that defense counsel was objecting because "probation" may have meant Lassa was a convicted thief or burglar. (Cf. *People v. Huggins* (2006) 38 Cal.4th 175, 206 ["[C]ounsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to

them"]; see also *People v. Campbell* (2020) 51 Cal.App.5th 463, 504-505 [" ' "[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings." ' "].)

A tactical decision to refrain from objecting was also consistent with trial counsel's strategy of portraying Lassa more straightforwardly, telling the jury: "Look, my client is no angel. Okay? There's criminal activity going on throughout this whole case, but … you cannot tie my client to those [burglaries]." And again later: "I want you to hold my client responsible for what he's guilty of, what the State can prove beyond a reasonable doubt … which I submit is the felony possession of stolen property and burglary tools."[7]

After all, the evidence of Lassa's possession of stolen property and his attempts to sell or barter for it was overwhelming. Counsel's entire strategy was to attempt to portray Lassa as a drug user who merely received and sold stolen property — a "fence" as it were — but that he was not the burglar. By doing so, counsel may have avoided

---

[7] In his reply brief, Lassa admits that "*it might be conceivable* that defense counsel had this motivation," [italics added] but then summarily insists "such a strategy would not have been *reasonable* [original italics] when [Lassa's] defense appeared to have been based on him having a limited amount of criminality — that is, enough to stretch to keeping (and possibly 'fencing') property stolen from burglaries, but not as far as personally violating the homes of multiple neighbors." The fact Lassa now concedes such a strategy "might be conceivable" certainly militates against satisfying the first component of *Strickland*'s ineffective of counsel test that " 'there could be no *conceivable* reason for counsel's acts or omissions.' " (*Johnsen, supra,* 10 Cal.5th at p. 1165, italics added.)

Moreover, it is unclear whether appellate counsel's conclusory remark that trial counsel's possible trial strategy was not reasonable is meant to express his expert opinion to this Court, and thereby satisfy his burden to "*demonstrate* that [trial] counsel's representation 'fell below an objective standard of reasonableness,' " as measured by the " 'prevailing professional norms,' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added.) If so, it not only lacks foundation, but it is inappropriate in this direct appeal. We thus decline to consider it, once more demonstrating why most ineffective assistance of trial counsel claims should instead be raised on habeas corpus. (*Hoyt, supra,* 8 Cal.5th at p. 958.)

objecting to the passing instances of the term "probation" because it might suggest to the jury that defense counsel was attempting to hide the reason why Lassa was on probation. (Cf. *People v. Wharton* (1991) 53 Cal.3d 522, 567 ["counsel might not have wanted to highlight the point with the jury and make it wonder if there really was such evidence"].) "Such a tactical choice was not objectively unreasonable under *Strickland*." (*Johnsen, supra,* 10 Cal.5th at p. 1165.)

In any event, because we are unable to determine on this appellate record why counsel did not object, the issue is better left to habeas corpus, where the answer to such a question may be fully pursued. For purposes of this direct appeal, we cannot say there "simply could be no satisfactory explanation" for letting the tangential references to the terms probation or probation search slip by without objection. (*Arredondo, supra,* 8 Cal.5th at p. 711.) Lassa has therefore failed to meet his burden on the first component of the test, i.e., to show trial counsel's "representation 'fell below an objective standard of reasonableness,' " as measured by " 'prevailing professional norms,' " (*Wiggins, supra*, 539 U.S. at p. 521.) Consequently, his ineffective assistance claim on direct appeal founders at the first stage and we need not assess the second.

## II.  Inadmissible Character and Hearsay Evidence

Lassa next claims that the trial court prejudicially erred by allowing improper character evidence of Lassa's reputation in the neighborhood in violation of Evidence Code section 1101, subdivision (a), and inadmissible hearsay evidence under Evidence Code section 1200. More specifically, he contends the court abused its discretion by permitting two witnesses to testify they believed Lassa was responsible for the spate of neighborhood burglaries in part because of his "reputation" in the neighborhood community and because of what other neighbors had said. We find no error.

### A.  Additional Factual Background

### i.  Adam H.

About a month before Lassa's April arrest, Adam H., who also lived in the neighborhood, and who later repaired one of the burglary victim's damaged front door,

had seen Lassa riding a bicycle carrying a power drill and a lap-top computer or small flat-screen television monitor under his arm about a mile from the victim's house.

During direct examination, Adam H. testified:

"[Prosecutor:] Why is it that you believed the items you saw in [Lassa's] hands as he's riding the bike were stolen?

"[Defense Counsel:] Objection. Calls for speculation.

"The Court: Well, it's not speculation what he thought. It's speculation as to what really happened. [¶] But maybe the better question, if you don't mind, is to ask him why he called the police.

"[Prosecutor:] Why did you call the police?

"[Adam H.:] You know, I called the police because I'm looking out for my neighborhood, and I just don't believe — over the years in passing by his house, I've seen and heard a lot of things coming from that residence, a lot of alcohol, a lot of drugs, a lot of fighting. [¶] We're a part of the community garden across the street from that residence, and we've been a part of that community garden for many, many years. And in the times we've been down at the garden, there's been a lot of chaos that has happened at [Lassa's] residence, a lot of police showing up. [¶] There's been times he's been in the middle of the street blocking me coming home on drugs, alcohol. I've driven around him. [¶] I've talked to the local maintenance man for lower Crystal Falls. He has shared a lot of stories.

"[Defense Counsel:] I'm going to object. It's not relevant. It's a narrative.

"The Court: Sustained. Let's be more focused. Okay? So you had this background. We don't need more of it.

"[Adam H.:] Sure.

"The Court: Why did you call the cops was the question?

"[Adam H.:] So I called the cops because I'm in construction. And I noticed, first off, he had, you know, a DeWalt drill and he's on a bicycle, you know, with — in the middle of the day with what, you know, looked like a computer underneath his arm and a drill. [¶] And I — you know, I hate to say it, but I just assumed that he had just ripped somebody off. And so I got home, and I kind of — I kind of went back and forth in my head on whether I should make a call. And I just decided to make a call because — you know, he

doesn't live far from me, and I don't want him stealing from me, so — that's why I made the call."

No objection was made to this last question or to Adam H.'s response.

### ii. Nicholas E.

Nicholas E., the victim in count 2, owned a residence on Crystal Falls Drive he had inherited from his recently deceased father, and he was in the process of moving from Arizona. He spent the night there in the middle of February and he noticed his father's chainsaw was missing. He did not think about it being stolen at the time because he had asked the son of his father's girlfriend Marilyn to come by and take it. He later determined the son had forgotten to do so. The chainsaw was not recovered.

Nicholas E. returned in March and noticed a Yeti Cooler and a bicycle were now missing. He also noticed that it looked as if someone had used a crowbar or hammer to pry open a door to his residence; the damage to the door had not been there when he had last been at the house. Nicholas E. later recovered the Yeti Cooler from the Sheriff's office.

During direct examination, Nicholas E. testified:

"[Prosecutor:] Okay. So when you first saw this chainsaw missing in February, you assumed perhaps it was Marilyn's son that had taken it?

"[Nicholas E:] Yep. So — like I said, I noticed it the morning before I left back to Arizona. I never even thought about anything being stolen. I kind of figured [the son] may have grabbed it. [¶] And then after the second time, that's when I asked … [the son], did you end up grabbing anything? He said, no, I completely forgot to grab anything. I was, like, well, okay. Three things are missing. [¶] … [S]ome neighbors I know — John and Lydia live across the street were out front. [Marilyn] went over there, and Lydia mentioned that everyone knew it was [Lassa] [¶] So even before April — I received a text message April 13th from Marilyn with the article saying that [Lassa] was caught.

"[Defense Counsel:] Hold on. I'm going to object, Your Honor.

"The Court: Yeah. Let's do a little more question, answer."

## B. Analysis

" '[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.' " (*People v. Thomas* (2021) 64 Cal.App.5th 924, 970.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ibid.*)

Even so, as mentioned *ante*, as a threshold matter a reviewing court will generally not consider a challenge to the admissibility of evidence unless there was a timely and specific objection in the trial court on the same grounds sought to be urged on appeal. (*Gomez, supra,* 6 Cal.5th at p. 286; see Evid. Code, § 353, subd. (a).)[8]

In this case, Lassa did not object that Adam H.'s testimony included improper reputation or character evidence, or that what Nicholas E. said about what Lydia had told Marilyn was hearsay. "We therefore will not consider these claims on appeal," and find them forfeited. (*People v. Champion* (1995) 9 Cal.4th 879, 918, rejecting claims under Evid. Code, §§ 1101 and 352]; accord *People v. Camacho* (2022) 14 Cal.5th 77, 118-119 (*Camacho*); *People v. Valdez* (2012) 55 Cal.4th 82, 130, and cases cited ["defendant's argument under Evidence Code section 1101 is not cognizable on appeal because he failed to object on this basis at trial"]; see also *People v. Romo* (2016) 248 Cal.App.4th 682, 695 [hearsay claim on appeal not preserved by relevancy and foundational objections at trial].)

---

[8] In full, Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was *timely made and so stated as to make clear the specific ground of the objection or motion*; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded *on the ground stated* and that the error or errors complained of resulted in a miscarriage of justice." (Italics added.)

14.

Forfeiture notwithstanding, as for Adam H.'s testimony, the trial court *sustained* defense counsel's objection to the Adam H.'s description of his past experiences with Lassa as irrelevant. Similarly, when Nicholas E. stated that his neighbor Lydia "mentioned that everyone knew it was [Lassa]" who had been the neighborhood culprit, the trial court acknowledged defense counsel's objection and told the prosecutor to instead couch his inquiries as questions and answers.[9]

Furthermore, the trial court later instructed the jury that if it sustained an objection, the jury should "disregard [the testimony] and must not consider that testimony for any purpose." (See CALCRIM No. 222.) We presume the jury followed the court's instructions. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) Indeed, that presumption is a crucial underpinning of our constitutional system of trial by jury. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Lassa has provided nothing to rebut this presumption and there is nothing in the record to indicate the jury failed to heed the court's admonishment in this case.

## III. The Conditional Examination

Lassa next claims that his conviction in count 1 must be reversed because the trial court abused its discretion by permitting the victim's testimony to be presented to the jury via a videotaped conditional examination that failed to strictly comply with the procedural statutory requirements. We disagree.

### A. Additional Factual Background

Because the trial court was engaged in another trial, the trial in this matter was continued several times. On Thursday, September 10, 2020, the parties appeared and there was uncertainty as to the last day that Lassa could be tried. Defense counsel

---

[9] Defense counsel did not specify a ground for his objection, which itself is insufficient to preserve it for appeal, but in context it appears defense counsel was objecting to Nicholas E.'s testimony as being a narrative. The court's comment about more questions and answers supports this explanation. In any event, counsel did not "make clear the specific ground of the objection" was on hearsay grounds. (Evid. Code, § 353, subd. (a).)

15.

ultimately agreed that without a time waiver the last date trial could commence was September 16. Lassa was willing to waive time but only if he was released from custody, a condition to which the prosecutor would not agree.

The prosecutor told the court and defense counsel that Daniel P., the victim in count 1 and one of his necessary witnesses, was scheduled to go out of the state on September 17 and was not planning to return until October. He requested that the court hold a conditional examination of Daniel P. prior to September 17. Defense counsel objected to a conditional examination because he was concerned something might come up during the trial that may be relevant to his cross-examination of Daniel P., which of course is true of any conditional examination.

The trial court invited briefing, to be filed by Monday, September 14, and set two hearings for Tuesday, September 15: the first to determine whether the examination should be allowed, and the second to actually conduct a videotaped examination if it was to be permitted. The prosecutor stated, "I'll go ahead and file a conditional examination – I've done them before – just so we have a clean record." Inexplicably, he did not; nothing was filed by either party.

On September 15, defense counsel again objected to the conditional examination on the ground that the prosecutor had failed to file and serve an affidavit in support of such an examination as is required by statute. The prosecutor stated that he had planned to file a formal motion for conditional examination with an affidavit but did not explain why he failed to do so, and the trial court did not inquire further. The prosecutor instead argued his oral notice to the court and counsel on September 10 on the need for a conditional examination was sufficient. He also claimed his request was statutorily timely because he had provided oral notice as soon as he knew about the unavailability of the witness. He suggested the court could hold a separate hearing, where the witness would testify under oath, which could serve as a foundational "affidavit" in support of conducting a conditional examination.

Defense counsel responded that the statute required a written affidavit and that the court should just release Lassa from custody and the People could call their witness when

16.

he was again available. He reiterated a general objection to a conditional examination held without the prosecutor complying with all the formal statutory requirements.

The court ruled the defense had received timely oral notice with respect to the potential conditional examination of Daniel P. and the reasons for it. Moreover, because at least three days' oral notice had been given, the court found Lassa was not prejudiced by a lack of written notice. Furthermore, Lassa was not prejudiced by the lack of a formal written affidavit when the necessary prerequisites normally found in such an affidavit could be established with Daniel P.'s sworn testimony. Daniel P. was then called as a witness to determine whether the requirements for a conditional examination were met. He testified he was leaving California later that day and had made plans months earlier to drive up to the state of Washington for a vacation and the wedding of a friend's daughter, who was "like a niece to [him]," on September 26. His plans were made months before the hearing, and at a time when the original trial date of September 9 had not been a problem for him.

The trial court noted that Daniel P.'s conflict with the current September 16 trial date arose only because the trial had been "bumped" from September 9 due to the fact the court was engaged in an ongoing trial. It granted the prosecutor's request for a conditional examination, finding there was no prejudice to the defense from the lack of a formal affidavit in support of such an examination because "all of the stuff that was supposed to be in the affidavit was given to the Defense on [the previous] Friday and was confirmed about what the testimony has been." It further found Daniel P.'s sworn testimony itself satisfied the statutory requirements of an affidavit.

A videotaped examination of Daniel P. was then held, where the defense was able to fully cross-examine him. The following day, September 16, the trial began and the video recording of Daniel P.'s conditional examination was played for the jury and admitted into evidence.

## B. Legal Background

Section 1335, et seq. prescribes the procedures for taking depositions – or "conditional examinations" – of witnesses in criminal cases when a material witness is

17.

unavailable for trial. The statutory scheme vests the trial court with broad discretion to determine whether a conditional examination of a witness is warranted. (*People v. Williams* (2016) 1 Cal.5th 1166, 1201.)

"When a material witness … for the people, is about to leave the state … the people may apply for an order that the witness be examined conditionally." (§ 1336, subd. (a).) "The application shall be made upon affidavit stating all of the following: [¶] (a) The nature of the offense charged. [¶] (b) The state of the proceedings in the action. [¶] (c) The name and residence of the witness, and that his or her testimony is material to the defense or the prosecution of the action. [¶] (d) That any of the following are true: [¶] (1) The witness is about to leave the state …." (§ 1337.) "The application may be made to the court or a judge thereof, and must be made upon three days' notice to the opposite party." (§ 1338.) "If the court or judge is satisfied that the examination of the witness is necessary, an order must be made that the witness be examined conditionally, at a specified time and place, and before a magistrate designated therein." (§ 1339.) "The defendant has the right to be present in person and with counsel at the examination…." (§ 1340, subd. (a).) "The testimony given by the witness shall be reduced to writing and authenticated in the same manner as the testimony of a witness taken in support of an information. Additionally, the testimony may be video-recorded." (§ 1343.) A "video-recording may be shown by either party at the trial if the court finds that the witness is unavailable as a witness within the meaning of Section 240 of the Evidence Code. The same objections may be taken to a question or answer contained in the … video-recording as if the witness had been examined orally in court." (§ 1345.)

"An 'affidavit' is a *written* statement verified by oath or affirmation." (*People v. Griffini* (1998) 65 Cal.App.4th 581, 587, italics added; Code of Civ. Proc., § 2003.)

**C. Analysis**

Lassa now asserts there should have been a written affidavit because section 1337 requires it, and further argues that Daniel P.'s foundational oral testimony could not act as the functional equivalent of an affidavit.

In an analogous case, *People v. Ware* (1978) 78 Cal.App.3d 822 (*Ware*), the court discussed the three-day notice provision of section 1338. There, "the prosecution did not formally comply with that condition. However, the prosecutor stated that he had advised the [defense counsel] during the preceding week that he intended to videotape the preliminary hearing because [the victim] was returning to Spain." (*Id.* at p. 828.) On appeal, the court was "satisfied that the *substance* of Penal Code section 1335 et seq. re conditional examination was satisfied and that the [trial] court's ruling that the [videotaped] preliminary hearing amounted to a 'conditional examination under the totality of the circumstances' is correct." (*Ibid.*, italics added; cf. *People v. Jurado* (2006) 38 Cal.4th 72, 114 (*Jurado*) ["Although defendant did not receive the three days' notice to which section 1338 entitled him, he was not prejudiced by the shortened notice because seven days elapsed before the conditional examination began."].)

Here, the prosecutor also did not formally comply with the requirements of section 1337. His "application" gave oral notice rather than written. However, it was timely, and the trial court found no prejudice. There was no written affidavit from the prosecutor in support of holding a conditional examination, but Daniel P.'s testimony was actually better than a prosecutor's hearsay-laden affidavit because Daniel P. was present, was sworn, examined and cross-examined, and the trial court could directly determine whether it was "satisfied that the examination of the witness is necessary." (§ 1339.) Simply put, "the *substance* of Penal Code section 1335 et seq. re conditional examination was satisfied …." (*Ware, supra,* 78 Cal.App.3d at p. 828, italics added; cf. *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 610 ["whenever state law 'require[s] or permit[s]' facts to be evidenced by affidavits … [a] valid declaration has the same 'force and effect' as an affidavit administered under oath."].)

Lassa maintains he was prejudiced by the lack of a less reliable hearsay affidavit prepared by a prosecutor, as opposed to the direct sworn testimony of the witness himself, because without Daniel P.'s conditional examination testimony, there would have been insufficient evidence to convict him on count 1. The argument proves too much. *All* conditional examinations involve material witnesses whose testimony could

affect the outcome of the case; that is why they are *material*.  Lassa's theory of prejudice would mean *all* conditional examinations are similarly prejudicial and none would be allowed.

Moreover, the argument dodges the real question:  How was Lassa prejudiced by the fact the *procedural prerequisite* of a written affidavit was satisfied instead by the functionally equivalent, and more reliable, in-person testimony of the witness himself? In other words, how was Lassa prejudiced by the court's decision to allow a conditional examination procedurally premised on a testimonial "affidavit" rather than a written one? Lassa has not addressed this question and as a result has failed to show any prejudice based on the *form* of the "affidavit" in this case.

"Courts do not exalt form over substance."  (*Lehman v. Superior Court* (145 Cal.App.4th 109, 123; see Civ. Code, § 3528 ["The law respects form less than substance."].)  Moreover, "[n]o judgment shall be set aside … for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  (Cal. Const, art VI, § 13.)  This is not such a case.

We therefore conclude that Lassa "has failed to show that any prejudicial error occurred in the taking of [Daniel P.'s] conditional examination" without a formal written affidavit being filed.  (*Jurado, supra,* 38 Cal.4th at p. 115.)  By granting the prosecution's request for a conditional examination, "the trial court did not abuse the broad discretion with which the statutory scheme vested it".  (*Id.* at p. 114.)

## IV.  Cumulative Error

In his penultimate claim, Lassa summarily asserts that even were we to determine none of his assignments of error is individually prejudicial, they collectively constitute reversible error.  Not so.

Under the "cumulative error" doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*).) "The 'litmus test' for cumulative error 'is whether defendant received due process and a

fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  Lassa " 'was entitled to a fair trial but not a perfect one.' " (*Camacho, supra,* 14 Cal.5th at p. 132.)  Lengthy criminal trials with multiple witnesses and charges are rarely perfect, and we "will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Hill, supra*, 17 Cal.4th at p. 844.)  This trial was no exception.

The only potential evidentiary errors — the incidental references to Lassa's probationary status, or the possibility that a few comments by the witnesses about Lassa's reputation in the neighborhood, one hearsay-based — were all minor; especially when compared to the overwhelming evidence of guilt in this case.  The procedural flaw underlying the conditional examination was not prejudicial.  Thus, any possible errors during Lassa's trial were either not error or were harmless, and " ' whether considered individually or collectively' [citation], we reject [Lassa's] contention that his constitutional right to a fair trial was violated." (*Camacho, supra,* 14 Cal.5th at p. 132.)  Simply put, nothing here "rise[s] to the level of prejudice necessary to reverse any of [Lassa's] convictions." (*Miranda-Guerrero, supra,* 14 Cal.5th at p. 31.)

## V.  Remand for Resentencing

Lastly, Lassa contends the matter must be remanded for resentencing in light of two separate changes made to the statutory sentencing scheme that were enacted while his appeal was pending.  Specifically, because his sentence included upper terms on two counts, he claims he is entitled to be resentenced under two of the recently enacted portions of section 1170 now governing trial courts' discretion when imposing one of three possible terms under the determinate sentencing law.  The People agree remand for resentencing is required, and we concur.

### A.  Additional Background

As discussed, *ante*, the trial court sentenced Lassa to the aggravated upper term on the first burglary count (count 1) and the possession of stolen property count (count 10).  The probation report, which the sentencing court was required to consider (§ 1203, subd. (b)(3)), showed Lassa was born in August 1996, making him 23 years old at the time of his offenses.  The report further recommended five factors in aggravation:

21.

(1) "The manner in which the crime was carried out indicates planning, sophistication, or professionalism" (see Cal. Rules of Court,[10] rule 4.421(a)(8)); (2) "The crime involved an attempted or actual taking or damage of great monetary value" (see rule 4.421(a)(9)); (3) "The defendant's prior convictions are numerous or of increasing seriousness" (see rule 4.421(b)(2)); (4) "The defendant was on probation when the crime was committed" (see rule 4.421(b)(4)); and (5) "The defendant's prior performance on probation was unsatisfactory" (see rule 4.421(b)(5)). The probation officer "could find no circumstances in mitigation."

The probation report also summarized Lassa's prior record. According to a CLETS printout dated September 28, 2020, the report stated Lassa had no prior criminal convictions. Nevertheless, Tuolumne County Probation Department "records" were said to show a February 7, 2019, conviction for misdemeanor DUI (Veh. Code, § 23152, subd. (b)) and misdemeanor resisting arrest (§ 148), and a February 19, 2019, conviction for felony resisting or obstructing an executive officer (§ 69) and misdemeanor vandalism (§ 594, subd. (b)(1)). No further details about these 2019 convictions, or the facts underlying them, were included,[11] and the "records" are not in the appellate record. For purposes of our discussion, based on the record before us, nothing regarding Lassa's prior criminal history was presented to the trial court in the form of "certified record[s] of conviction." (See § 1170, subd. (b)(3).)

At the sentencing hearing, the trial court stated:

> "When determining whether to impose the mid term or even a
> mitigated term versus aggravated term, the – just the shear
> [*sic*] volume of burglaries that were involved in this case and

---

[10] All undesignated references to rules are to the California Rules of Court.

[11] Often mischaracterized as simply a "felony 148," section 69 makes it a crime to knowingly threaten to deter, prevent, or resist, with *force or violence*, an executive officer in the performance of his or her duties. (§ 69, subd. (a).) Police officers and sheriff's deputies are "executive" officers under the section. (*In re Manuel G.* (1997) 16 Cal.4th 805, 810; see CALCRIM No. 2652.) With a prior conviction for violating section 148, and the fact Lassa had to be forcibly detained by deputies in the current case, we have at least a hint of what his 2019 section 69 conviction may have involved.

the extensive planning in terms of getting other people involved – and I agree with [the prosecutor], there's no evidence that this was in any way ever going to stop unless [Lassa] was caught and – he would just continue to steal from people with apparent – with apparently no thought of what it might do to their lives, it's very troubling.

"So I did actually consider the mid term of four years in this case as the principle [*sic*] term.  But I don't see that [Lassa] has learned any lesson from this or shows any kind of responsibility or acknowledgement that this kind of thing is really, really hard on people when they have their homes broken into.

"… I haven't heard anything to suggest that he's not a continuing risk to society."[12]

[¶] … [¶]

"The crime in [c]ount 1 will be declared aggravated.  The court is basing its finding that it's an aggravated term under the … following circumstances in aggravation:

"[Lassa] was *on probation* at the time that he committed these crimes.  He showed *planning and sophistication, professionalism* in the way he carried out the crimes.  The *shear* [sic] *number of the crimes* is an aggravation.  He has *prior convictions that are numerous and increasing in seriousness*, and his *performance on probation has been unsatisfactory.*
"… I can find no circumstances in mitigation [and] [b]ased on the weight of those circumstances in aggravation, I'm going to deem the crimes to be aggravated."  (Italics added.)

---

[12] Failure to acknowledge wrong-doing is not listed in rule 4.421 as a factor affecting a trial court's decision to impose an aggravated sentence.  Instead, whether a defendant is remorseful is a factor to consider in deciding whether to grant probation (rule 4.414(b)(7), (b)(8)), although Lassa was presumptively ineligible for probation. (§ 462, subd. (a).)  A defendant's "continuing risk to society" is arguably referenced in rule 4.421(b)(1), but that factor refers to a defendant who "has engaged in *violent* conduct that indicates a serious danger to society."  (Rule 4.421(b)(1), italics added.) There is no indication of violence in counts 1 or 10, or any other count.

23.

In imposing an upper term sentence on count 10, the court simply stated, "The crime in [c]ount 10 will be declared aggravated." No reasons were given. Similarly, the court gave no reasons for why it was imposing consecutive sentences on the remaining burglaries. Of the five factors in aggravation found by the trial court only four are listed in rule 4.421. The fifth – the "number of crimes" – is not. Although "[t]he listing of factors in the[] rules for making discretionary sentencing decisions is not exhaustive and does not prohibit a trial judge from using additional criteria reasonably related to the decision being made," (see rule 4.408(a)) [the number of counts in a case is normally a factor affecting the issue of whether sentences should be served consecutively or concurrently].) (See, e.g., rule 4.425(a)(1) [crimes and their objectives were predominantly independent of each other] and (a)(3) [crimes were committed at different times and separate places rather than so closely committed in time and place as to indicate a single period of aberrant behavior].) In fact, the probation report cited these two subdivisions of rule 4.425 in its recommendations for consecutive terms.

Here, however, the trial court did not list its reasons for running the terms consecutively, which itself was error. (See rule 4.406(b)(4) [court must state reasons for consecutive terms].) Even assuming the court followed the probation officer's recommendations to impose consecutive sentences under rule 4.425,[13] it could not use those same reasons to also impose an upper term on counts 1 and 10. In other words, even though "[t]here is no persuasive reason why the trial court should not be allowed to consider the fact of multiple victims as a basis for imposing either the upper term or a consecutive sentence … *it cannot do both.* (*People v. Calhoun* (2007) 40 Cal.4th 398, 408, italics added; see also rule 4.425(b)(1).)[14] Thus, even though the number of crimes

---

[13] The trial court stated, "So I'm going to follow the Probation Department's recommendation," and "impose[ sentence] as recommended…."

[14] "Effective January 1991, 'multiple victims,' which had been listed as an aggravating circumstance in former rule 421(a)(4), was deleted. The Advisory Committee comment explained it 'was deleted to avoid confusion; cases in which that possible circumstance was relied on were frequently reversed because there was only a single victim *in a particular count.*' " (*People v. Crabtree* (2009) 169 Cal.App.4th 1293,

24.

Lassa committed was established beyond a reasonable doubt by virtue of the jury's verdicts on the separate counts, the trial court's apparent dual use of that fact as both a circumstance in aggravation justifying an upper term sentence on both counts 1 and 10 *and* a reason for imposing consecutive sentences was incorrect even under the former version of section 1170.

The remaining four factors in aggravation the trial court found were: (1) Lassa was on probation at the time he committed the crimes; (2) His performance on probation had been unsatisfactory; (3) He had "numerous" prior convictions of increasing seriousness; and (4) He showed "planning and sophistication, professionalism" in the way he carried out each of the crimes. Of these four, their underlying facts were neither stipulated to by Lassa, found true beyond a reasonable doubt by the jury or the trial court, nor established by certified records of conviction.

### B. Analysis

When Lassa was sentenced, trial courts had broad discretion under section 1170, subdivision (b) to select the "appropriate term" for offenses that could be punished by three possible terms. (Former § 1170, subd. (b); Stats. 2018, ch. 1001, § 1.) However, while this appeal was pending, the Legislature enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) (SB 567), which amended section 1170 (Stats. 2021, ch. 731, § 1.3).[15] The

---

1326, fn. 11, italics added.) This underscores the fact that imposing an aggravated term focuses on a single count, not a series of unrelated crimes occurring at different times and locations against different victims.

[15] Three bills amending section 1170 were enacted and signed into law on the same date during the 2021–2022 legislative term: SB 567 (Stats. 2021, ch. 731, § 1.3); Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5); and Assembly Bill No. 1540 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 719, § 2). SB 567 takes precedence over the other two because it bears the highest chapter number and was enacted last. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.) SB 567 states that if all three bills amending section 1170 are enacted and become effective on or before January 1, 2022, and SB 567 is enacted last, then section 1.3 of that bill, which incorporates the amendments proposed by SB 567, Assembly Bill No. 124, and Assembly Bill No. 1540, shall become operative. (Stats. 2021, ch. 731, § 3.)

new section 1170 became effective on January 1, 2022. (See Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).) Two of SB 567's amendments to section 1170 are relevant here.

First, SB 567 made "the middle term of imprisonment the *presumptive* sentence." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500 (*Flores*), italics added; see § 1170, subd. (b)(1).) Thus, "[a] trial court may impose an upper term sentence *only* where there are aggravating circumstances in the crime *and* the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt." (*Flores, supra,* at p. 500, italics added; see § 1170, subd. (b)(2).) However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Therefore, section 1170 now requires *all* aggravating circumstances relied upon by the trial court in imposing an upper term to meet the requirements of section 1170, subdivision (b)(2) or (b)(3), This amendment applies retroactively to Lassa because his conviction was not final when the legislation took effect. (See *Flores, supra,* 75 Cal.App.5th at p. 500; *In re Estrada* (1965) 63 Cal.2d 740, 744; see also *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465.)

As discussed above, the aggravating factors the trial court used to impose aggravated sentences on counts 1 and 10 did not satisfy either section 1170, subdivision (b)(2) or (b)(3). In their original briefing, the parties acknowledged as much but disagreed on whether, in retrospect, the errors were harmless or whether the matter should be remanded for resentencing. However, an unbriefed additional wrinkle arose because SB 567 also enacted section 1170, subdivision (b)(6) (hereafter simply subdivision (b)(6)), which also became effective January 1, 2022. We ordered supplemental briefing on the separate impact of subdivision (b)(6), and the parties now agree remand for resentencing is necessary.

Subdivision (b)(6) created an additional sentencing presumption for certain defendants, specifying that a trial court "shall order imposition of the *lower* term if any [enumerated circumstance] was a contributing factor in the commission of the offense." (Italics added.) One such circumstance is when the "person is a youth, or was a youth … at the time of the commission of the offense." (Subd. (b)(6)(B).) In this context, a "youth" is defined as "any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b).) Like subdivisions (b)(2) and (b)(3), subdivision (b)(6) also "applies retroactively to nonfinal cases on direct appeal." (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095; accord *People v. Banner* (2022) 77 Cal.App.5th 226, 240 (*Banner*).) This additional presumption in favor of the lower term can only be overcome if "the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." (Subd. (b)(6).)

The record reflects Lassa was born in August 1996, making him 23 years old at the time of his offenses. The trial court did not have the benefit of subdivision (b)(6) and therefore it did not conduct the analysis now required by that subdivision. Rather than starting with the lower term as now required, the court merely balanced the aggravating circumstances against then non-existent mitigating circumstances,[16] and imposed an upper term for both counts 1 and 10 but made no findings regarding whether a lower term sentence would be contrary to the interests of justice.

Consequently, because Lassa was sentenced before the amendments to section 1170, subdivision (b) became effective, the trial court imposed aggravated terms on counts 1 and 10 without considering either of the two presumptive terms that are now applicable to Lassa under the revised statute. Moreover, because the aggravating factors

---

[16] The felony sentencing rules now include as a factor in mitigation that "[t]he defendant is under 26 years of age, or was under 26 years of age at the time of the commission of the offense." (Rule 4.423(b)(6), amended effective March 14, 2022.)

the trial court did find were themselves neither stipulated to nor proven beyond a reasonable doubt, they are now even further undermined for purposes of our review.

In general, a remand for resentencing is required "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).) Mere speculation about what the trial court would have done under the new law is insufficient to satisfy the "clearly indicated" standard. (*People v. Bell* (2020) 47 Cal.App.5th 153, 199–200.)

Considering subdivision (b)(6)'s presumptive lower term, and subdivision (b)(1)'s additional presumptive midterm, nothing in the record "clearly indicates" the trial court would still have imposed two upper terms sentences had those subdivisions been in effect at the time of Lassa's sentencing.

For instance, at the sentencing hearing, in arguing against the probation report's recommendation of an upper term, defense counsel argued: "Mr. Lassa, he's relatively young. I think he's 23 or 24." The prosecutor did not respond but the trial court rebuffed the argument, stating only, "I understand he's young and this will have a significant impact on his life, but he apparently has no consideration for having any impact on other people's lives." Even though the trial court imposed upper terms by weighing aggravating factors against mitigating factors, subdivision (b)(6) now requires not only that "the aggravating circumstances outweigh the mitigating circumstances" but also that "imposition of the lower term would be contrary to the interests of justice." We cannot confidently construe the court's single brief remark about Lassa's age as clearly indicating it would have found "imposition of the lower term would be contrary to the interests of justice." (Subd. (b)(6).)

The People concede the matter must be remanded in light of subdivision (b)(6)'s changes, and we accept their concession. As such, we need not also decide whether remand would be independently compelled by the changes that were made by subdivision (b)(2) and (b)(3), or whether the trial court's sentencing errors in that regard were harmless. Even so, we note that with two separate section 1170, subdivision (b)

28.

sentencing errors conjoined, it is even less clear just what the trial court would have done under the new law in a way sufficient to satisfy the "clearly indicated" standard of *Gutierrez, supra,* 58 Cal.4th at p. 1391.

At the same time, we emphasize that we express no opinion as to whether Lassa's youthfulness was in fact a contributing factor to the crimes he committed under subdivision (b)(6), whether after the matter is fully argued and the record developed, imposing the presumptive lower term on counts 1 and 10 would in fact be contrary to the interests of justice, or even whether the factors in aggravation would outweigh the presumptive middle term of subdivision (b)(1). Instead, "[t]hose are questions best left to the trial court to answer in the first instance." (*Banner, supra,* 77 Cal.App.5th at p. 242.)

Because the changes made to section 1170 retroactively apply, on remand the trial court must incorporate them when it resentences Lassa and must make any requisite findings accordingly. Furthermore, "[w]e conclude the need to apply amended section[] 1170, subdivision (b) … creates sufficiently ' "changed circumstances" ' [citation] to warrant a full resentencing." (*People v. Jones* (2022) 79 Cal.App.5th 37, 46.) On remand, therefore, the trial court may fully resentence defendant anew when it incorporates the new legislative changes. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant."]; accord *People v. Buycks* (2018) 5 Cal.5th 857, 893 [" 'the full resentencing rule' "].)

On remand both the prosecution and Lassa shall have the opportunity to present additional evidence and information to permit the trial court to make its fully informed sentencing decisions under the current version of section 1170, subdivision (b).

## **DISPOSITION**

The judgment is reversed in part and affirmed in part. The sentence is reversed and vacated, and the matter remanded for resentencing consistent with the intervening changes made to section 1170, subdivision (b). We express no opinion what sentence should be imposed on remand. Following resentencing, the superior court clerk is directed to prepare an amended abstract of judgment and forward a certified copy to the

29.

Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


SNAUFFER, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.